# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| Serena Anderson, | |
| *Plaintiff,* | No. 22 CV 837 |
| v. | Judge Lindsay C. Jenkins |
| Lawrence Hall Youth Services, | |
| *Defendant.* | |

### MEMORANDUM OPINION AND ORDER

Plaintiff Serena Anderson, proceeding *pro se*, brings this employment discrimination action against her former employer, Defendant Lawrence Hall Youth Services. She alleges that, in November of 2020, Defendant terminated her employment in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112 *et seq.*, and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*[1] Before the Court are cross-motions for summary judgment, [Dkt. No. 58] (Defendant); [Dkt. No. 68][2] (Plaintiff). For the reasons that follow, the Court grants Defendant's motion for summary judgment in full. Plaintiff's cross-motion is, accordingly, denied, and this case will be terminated.

---

[1] She also brought a claim under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, but that claim was dismissed for failure to exhaust administrative remedies. *See* [Dkt. No. 16].

[2] As the Court will discuss in greater detail below, it is not entirely clear which of Plaintiff's filings is her cross-motion. Docket entry 68 is identified as Plaintiff's cross-motion in CM/ECF.

I.     **Background**

A.     **Threshold Issues**

A tension can sometimes arise between two competing principles governing *pro se* litigation. On the one hand, both the Supreme Court and the Seventh Circuit have repeatedly reminded district courts that "document[s] filed *pro se*" must be "'liberally construed'"—in recognition of the fact that *pro se* litigants should "'be held to less stringent standards than . . . lawyers.'" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)); *Millikan v. Town of Ingalls*, 2022 WL 3928516, at *1 (7th Cir. Aug. 31, 2022) ("We construe pro se briefs liberally.").

On the other hand, "even *pro se* litigants must follow rules of civil procedure." *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006); *Townsend v. Alexian Bros. Med. Ctr.*, 589 Fed. App'x 338, 339 (7th Cir. 2015). This obligation extends not only to the Federal Rules of Civil Procedure themselves, but also to the local rules promulgated by each judicial district pursuant to Rule 83(a) and to orders issued by individual judges in the discretionary regulation of practice before them. *See* FED. R. CIV. P. 83(b). Such rules and orders exist for a reason, and failure by any litigant to follow them can throw a wrench into a case, impeding the "just, speedy, and inexpensive determination" of the action to the detriment the parties, the judge, and the judicial system at large. FED. R. CIV. P. 1.

Before the Court summarizes the factual record, it must iron out several such wrinkles that make deciding this case especially difficult, beginning with (1) which of Plaintiff's filings is, in fact, her cross-motion for summary judgment; and (2)

Plaintiff's failure to comply with Local Rule 56.1 and her attempt to introduce evidence through unsworn filings.

### 1. *Plaintiff's Filings*

It is difficult to ascertain which of Plaintiff's many filings is, in fact, her cross-motion and which of her filings, instead, merely responds in opposition to Defendant's cross-motion. [Dkt. No. 70, 6]. This is a problem because, ordinarily, when "parties submit[] cross-motions for summary judgment," courts must consider them separately, "one at a time." *Black Earth Meat Market, LLC v. Vill. of Black Earth*, 834 F.3d 841, 847 (7th Cir. 2016); *Williams v. Swenson*, 747 Fed. App'x 432, 433 (7th Cir. 2019). In order to do so, a court must, of course, be sure which filings relate to which cross-motion.

Defendant moved for summary judgment on March 31, 2023. [Dkt. No. 58]. Along with its moving papers, Defendant served Plaintiff with copies of Federal Rule of Civil Procedure 56 and Local Rule 56.1, as well as a Local Rule 56.2 "Notice to Unrepresented Litigants Opposing Summary Judgment." *See* L.R. N.D. Ill. 56.2; [Dkt. No. 61] (certificate of service). That notice walks *pro se* litigants through the rules that all litigants "must follow in moving for or opposing summary judgment." L.R. N.D. Ill. 56.2. Among other things, it identifies four "separate documents" that every *pro se* litigant responding to a motion for summary judgment must file:

(1) "a response to the defendant's statement of material facts";

(2) "a statement of additional facts, if you want the judge to consider facts not included in the defendant's statement of material facts or your response to the defendant's statement";

(3) "the evidentiary material that supports your response to the defendant's statement of facts and any statement of additional facts (the material should be labeled as exhibits); and"

(4) "a memorandum of law that explains why the defendant is not entitled to summary judgment based on the facts and the law . . . ."

*Id.*[3]

Prior to receiving this notice, Judge Guzman—who then presided over this matter—ordered Plaintiff to combine her cross-motion for summary judgment with her response in opposition to Defendant's motion for summary judgment. [Dkt. No. 57]. Judge Guzman's order required that Plaintiff file this combined brief on April 21, 2023, and that Plaintiff file her reply in support of her cross-motion on June 2, 2023. [*Id.*]

In response to both Judge Guzman's briefing order and the Local Rule 56.2 notice, Plaintiff filed seven documents—four on April 6, 2023, [Dkt. No. 64][4]; [Dkt. No. 65]; [Dkt. No. 66]; [Dkt. No. 67], two on April 17, 2023, [Dkt. No. 68]; [Dkt. No. 69], and one on May 19, 2023, [Dkt. No. 73]. These filings are not clearly labeled, and the Court has not been able to find the combined motion ordered by Judge Guzman. To make matters worse, the Court is not completely sure which filing is Plaintiff's cross-motion.

---

[3]    The notice addressed how Plaintiff's could meet her obligation to respond to a motion for summary judgment. It did not provide Plaintiff with similar guidance on what she needed to do to move for summary judgment herself.

[4]    Although this document is listed on the docket as having been filed on April 7, it bears an April 6 filing stamp.

The most likely candidate appears to be [Dkt. No. 68]. Plaintiff filed that document on April 17 and titled it "Plaintiff Cross motion of Defendant Lawrence Hall Youth Services." Although this filing is labeled as a cross motion, there are some indications that Plaintiff may have intended for it to merely supplement arguments she made in earlier filings. For one thing, [Dkt. No. 68] addresses itself almost exclusively to refuting arguments Defendant makes in support of *its* cross-motion. The document is three pages in length, and is shorter and less comprehensive in scope than many of Plaintiff's other filings. Finally, Plaintiff requests that the Court enter summary judgment in her favor in myriad other filings. [Dkt. No. 64, 9]; [Dkt. No. 65, 5]; [Dkt. No. 66, 5]; [Dkt. No. 67, 6].

These facts all suggest that Plaintiff may have filed these documents on the assumption that the Court would consider them both in support of her cross-motion and in opposition to Defendant's. It may well be that Plaintiff construed Judge Guzman's order—which required her to file a "combined" brief—as permitting *every* filing to do double duty. The Court would not penalize Plaintiff for failing to fully appreciate the technical rules governing cross-motion practice, particularly in light of the fact that the Local Rule 56.2 notice she received did not discuss this scenario.

For all of these reasons, the Court elects against attempting to divide Plaintiff's filings into separate piles—one stack of documents opposing Defendant's cross-motion and one stack supporting her own. Even if the Court could do so, it seems unlikely that Plaintiff filed any particular document on the understanding that that document would be considered only with respect to one motion or the other.

5

Proceeding that way would risk severe prejudice to her case. The Court prefers to decide cases on the merits, not on technicalities. In ruling on the parties cross-motions, it will therefore consider all of Plaintiff's arguments together.

2. *Local Rule 56.1*

The Court next addresses the consequences of Plaintiff's failure to comply with Local Rule 56.1. That rule serves a vital role in bringing cases at the summary judgment stage into focus. The Rule requires parties moving for and opposing summary judgment alike to identify the facts upon which they intend to rely and to support those facts with citations to specific evidence in the record. *See Lipinski v. Castaneda*, 830 Fed. App'x 770, 771 (7th Cir. 2020). The Rule serves to "inform the court of the evidence and arguments in an organized way—thus facilitating its judgment of the necessity for trial." *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995).

The nuts and bolts of the rule are straightforward. Any party moving for summary judgment must serve and file a statement of material facts—concisely set forth in numbered paragraphs and supported with specific citations to the record—on which the moving party contends there can be no genuine dispute. L.R. 56.1(a)(2), (d). The non-moving party must then serve and file a response to this statement. L.R. 56.1(b)(2). That response must reproduce the text of each of the moving party's asserted facts. L.R. 56.1(e)(1). The non-movant must then admit, dispute, or admit in part and dispute in part the factual content of each paragraph. L.R. 56.1(e)(2). If the non-movant disputes a fact, she must cite to "specific evidentiary material that

controverts the fact and . . . concisely explain how the cited material controverts" it. L.R. 56.1(e)(3). If the non-movant wishes for the Court to consider any additional facts, she must file, as a separate document, a statement of additional facts supported by citations to the record. L.R. 56.1(b)(3). The non-movant must attach to her response or statement of additional facts all evidence that the movant has not already attached to its statement of facts. L.R. 56.1(b)(2), (3).

A non-movant may not create a genuine dispute of fact through unsupported denials of the movant's factual assertions. Rather, she must direct the Court's attention to specific evidence in the record that calls the movant's factual assertions into question. That evidence can come in a variety of forms, *see* FED. R. CIV. P. 56(c)(1)(A), but it ultimately must be "admissible as evidence at trial, 'although the form produced at summary judgment need not be admissible.'" *Igaski v. Ill. Dep't of Fin. and Prof'l Regulation*, 988 F.3d 948, 955–56 (7th Cir. 2021) (quoting *Wragg v. Vill. of Thornton*, 604 F.3d 464, 466 (7th Cir. 2010).

The Local Rule 56.2 notice Defendant served on Plaintiff elaborates on all of these requirements—including Plaintiff's evidentiary burden—in even greater detail. Among other things, it informed Plaintiff that (1) to properly dispute a fact she needed to "cite the specific page(s) of evidence that supports [her] position," [Dkt. No. 61, 9]; (2) if Defendant did not previously submit that evidence with its statement of facts, she was required to "include that additional evidence in an appendix filed and served along with [her] response," [*id.*]; and (3) she had to support any additional facts upon which she intended to rely "with a specific piece of evidence that supports

it," [*id.* at 11]. The notice directed Plaintiff to examples of Rule 56.1 statements, available on the Northern District's website, and referred her to the William J. Hibbler Memorial Pro Se Assistance Program. [*Id.* at 8, 10].

Plaintiff has fallen far short of her obligations under the Rule—both to respond to the facts asserted by Defendant in its statement of facts and to cite to specific evidence supporting her claims. She has filed neither a response to Defendant's Rule 56.1 statement of facts, [Dkt. No. 60], nor a statement of additional facts. Nor did she file a proper Local Rule 56.1(a)(2) statement of facts as part of her motion for summary judgment. The five-page "Statement of Facts" at [Dkt. No. 64, 1–5] does not provide any citations to evidence in the record or contain numbered paragraphs.

In response, Defendant encourages the Court to strictly enforce Local Rule 56.1 and deem its statement of facts admitted to the extent supported by record evidence. [Dkt. No. 70, 3–4]. The Court would be well within its discretion to do so. *See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008). "Because of the high volume of summary judgment motions and the benefits of clear presentation of relevant evidence and law," the Seventh Circuit has "repeatedly held that district judges are entitled to insist on strict compliance with local rules designed to promote the clarity of summary judgment filings." *Stevo v. Frasor*, 662 F.3d 880, 886–87 (7th Cir. 2011).

The Court elects against strict enforcement for several reasons. First, the record in this case is not voluminous. Second, there would seem to be little risk of prejudice to Defendant in considering the full scope of the record, in light of the fact

that Plaintiff has failed to come forward with any evidence of her own, with the exception of her verified complaint. Third, and finally, Plaintiff's "Statement of Facts," while deficient, does pull extensive material from her complaint, though admittedly without citing to it. Because that complaint was verified, "it is . . . the equivalent of an affidavit for purposes of summary judgment," *Beal v. Beller*, 847 F.3d 897, 901 (7th Cir. 2017) (quoting *Ford v. Wilson*, 90 F.3d 245, 246 (7th Cir. 1996), and may be considered as evidence to the extent it is based on personal knowledge. *Ani-Deng v. Jeffboat, LLC*, 777 F.3d 452, 454 (7th Cr. 2015); FED. R. EVID. 602.

In line with the preference against deciding cases on technicalities, the Court will overlook Plaintiff's failure to abide by Local Rule 56.1 and consider the full record, accepting Defendant's version of events only when unrefuted by evidence in the record. The Court's decision to overlook Plaintiff's non-compliance with Local Rule 56.1 does not absolve her of her duty to come forward with admissible evidence, both in opposition to Defendant's cross-motion for summary judgment and in support of her own. Aside from a few stray references to evidence adduced by Defendant, Plaintiff's filings rely largely upon the allegations of her verified complaint. The failure to develop a fuller record ultimately dooms Plaintiff' claims.

### 3. *Plaintiff's Unsworn Testimony and Her Verified Complaint*

Two final threshold issues must be addressed. Plaintiff attempts throughout her filings to introduce new facts into the case that were not included in her verified complaint and do not appear anywhere else in the record, including her deposition transcript. Instead of filing a separate affidavit or declaration memorializing this

testimony, or even verifying her filings, *see, e.g.*, *Johnson v. Jung*, 2009 WL 3156743, at *9 (N.D. Ill. Sept. 28, 2009), Plaintiff has simply attempted to inject them into the case through her briefs.

This she cannot do. In order for a party's own testimony to be considered at summary judgment, it must be presented "through one of the vehicles designed to ensure reliability and veracity," *Martz v. Union Labor Life Ins. Co.*, 757 F.2d 135, 138 (7th Cir. 1985), namely an affidavit, sworn declaration, or unsworn declaration complying with 28 U.S.C. § 1746. *Pfeil v. Rogers*, 757 F.2d 850, 859–60 (7th Cir. 1985). Plaintiff's filings do not qualify as any of these things.

For these reasons, the Court is simply unable to consider any facts newly introduced by Plaintiff's filings—including those that provide crucial context for statements Plaintiff made during her deposition or events discussed by Plaintiff's verified complaint. This should not come as a surprise to Plaintiff. Her Local Rule 56.2 notice provided instructions on what to do to convert her own testimony into evidence that the Court could consider at summary judgment. In relevant part, the notice advised that

> [i]f you want to submit evidence of your own testimony (other than a deposition transcript), you should prepare an affidavit or declaration, which sets forth facts you know to be true based on your personal knowledge. An affidavit must be signed and notarized, while a declaration must be signed and include the following language from 28 U.S.C. § 1746: "I declare under penalty of perjury that the foregoing is true and correct. Executed on [insert date]. [Signature]."

[Dkt. No. 61, 11].

With Plaintiff's unsworn testimony out of the equation, the *only* valid evidence Plaintiff has put forward is her verified complaint (and the email correspondence attached to it). There are problems with that, too, namely Plaintiff's admission during her deposition that several key allegations are not true, including paragraph 9, [Dkt. No. 60-3, Anderson Dep. Tr., 40:20–41:7], paragraph 10, [*id.* at 41:8–16], and paragraph 24, [*id.* at 65:3–21]. In light of these admissions, the Court will disregard those paragraphs and consider those portions of Plaintiff's verified complaint that are made on personal knowledge, *Foster v. PNC Bank, N.A.*, 52 F.4th 315, 320 (7th Cir. 2022), and that do not draw legal conclusions. *Greene v. Westfield Ins. Co.*, 963 F.3d 619, 627 (7th Cir. 2020).

B.    **The Facts**

Having cleared away these cobwebs, the Court can now summarize the factual record. Unless the Court notes otherwise, all facts recounted herein are undisputed. Because the Court ultimately grants Defendant's motion for summary judgment, the Court "present[s] the facts . . . in the light most favorable" to Plaintiff. *Emad v. Dodge Cty.*, 71 F.4th 649, 650 (7th Cir. 2023).

1.    *Plaintiff's Pre-Leave Work History*

Defendant "is a non-profit child welfare organization that cares for children and youth who have emotional issues." [Dkt. No. 60, ¶ 4]. It is licensed by the State of Illinois to care for children placed in its custody "by the Illinois Department of Children and Family Services and by Cook County, Illinois, courts." [*Id.* at ¶ 5]. These

11

children, many of whom "have been through the foster system," [Dkt. No. 60-2, ¶ 2], suffer from "severe" emotional problems. [Dkt. No. 60-1, ¶¶ 4–5].

Defendant's main campus is located on the north side of Chicago, and consists of "a 4-story . . . residential building," "a school," and a "main administration building." [Dkt. No. 60, at ¶ 4.5]. "The residential building is known as the Children and Family Treatment Center, or 'CFTC.'" [*Id.*]. The first floor of the CFTC is "devoted to medical and other related business." [*Id.*] The second, third, and fourth floors are residential, and each contains to two units of housing. [*Id.*]

Plaintiff began working for Defendant on June 6, 2015, as a Medical Secretary on the first floor of the CFTC. [Dkt. No. 1, ¶ 6]; [Dkt. No. 60, ¶¶ 3, 9]; [Dkt. No. 60-3, Anderson Dep. Tr. 14:23–15:13].[5] Plaintiff was highly qualified for this position. Not only did she hold an associate degree in medical assisting and a bachelor's degree in healthcare management, [Dkt. No. 60-3, Anderson Dep. Tr. 10:17–11:24], she had extensive experience working in both medical assistant and administrative roles. [*Id.* at 12:5–14:7]. As a Medical Secretary, Plaintiff was responsible for "[t]ranscription," "charting . . . inventory," and a number of other tasks. [*Id.* at 14:23–15:8].

Plaintiff worked as a Medical Secretary until late 2018 or early 2019, when the position was eliminated, [Dkt. No. 1, ¶ 9]; [Dkt. No. 60, ¶ 9]; [Dkt. No. 60-3, Anderson Dep. Tr. 16:8–18],[6] ostensibly for budgetary reasons. [Dkt. No. 60-3, Exhibit 15, p.

---

[5]    At her deposition, Plaintiff recalled beginning with Defendant on June 1, 2015. The precise start date does not matter.

[6]    According to Plaintiff's verified complaint, the position was eliminated in 2018. According to Defendant's Rule 56.1 statement, the position was eliminated in 2019. The record suggests that there is some truth to both dates. The record contains a letter Plaintiff

252]. Defendant encouraged Plaintiff to apply for a new position, [*id.*], and she was ultimately hired as a Teacher's Assistant ("TA").[7] [Dkt. No. 60, ¶ 9]; [Dkt. No. 60-3, Anderson Dep. Tr. 17:8–13].

As a TA, Plaintiff worked at the school, not in the CFTC. [Dkt. No. 60-3, Anderson Dep. Tr. 17:8–13]. Although the record does not describe this position in tremendous detail, the job description describes the position as follows:

> Under the direct supervision of the Director of Educational Services, the Teacher Assistant works within a classroom giving assistance to the teacher for the improvement of classroom performance of individual students; assists the education team in maintaining student behavior in the school area by utilization of intervention techniques in line with Agency policy . . . .

[Dkt. No. 60-2, Exhibit 1, p. 4].

Although Plaintiff worked as a full-time TA, Defendant permitted her to work overtime in other roles. *See* [Dkt. No. 60-3, Anderson Dep. Tr. 40:20–41:7]. In addition to providing occasional medical transcription services to the Medical Department, [*id.* at 82:2–3], Plaintiff also worked as a Residential Treatment Specialist ("RTS"). [*Id.* at 17:22–18:1; 41:2–7]; [Dkt. No. 60, ¶ 9]. As an RTS, Plaintiff "provide[d] direct line

---

received on December 3, 2018, from Defendant's then-CEO Kara Teeple, informing her that the "Medical Secretary position will be eliminated effective December 17, 2018," and "encourag[ing] [her] to apply for any open positions that are available." [Dkt. No. 60-3, Exhibit 15, p. 252]. It also contains a portion of Plaintiff's personnel file indicating that her transfer to the position of Teacher Assistant was effective January 7, 2019. [*Id.*, Exhibit 3, pp. 197–98]. So while the position was eliminated in late 2018, Plaintiff started as a TA in early 2019. The specific date is immaterial to the parties' cross-motions.

[7]    Although Plaintiff's verified complaint states that she became a Residential Treatment Specialist ("RTS"), [Dkt. No. 1, ¶ 9], and that she "attended school to become a Teacher's Assistant" from 2018 to 2020, Plaintiff admitted during her deposition that neither of these assertions is "accurate." [Dkt. No. 60-3, Anderson Dep. Tr. 40:20–41:16].

13

of sight supervision" over children living in the CFTC's residential housing units. [Dkt. No. 60-2, Exhibit 2, p. 6].

In March 2020, Defendant shut down both the school and its administrative building in light of the COVID-19 pandemic. [*Id.*, Stubblefield Declaration, ¶ 3][8]; [Dkt. No. 60, ¶ 10]. In light of those closures, the only building on Defendant's main campus that remained in operation was the CFTC, where the children in Defendant's care continued to live. During this time, Defendant's administrative staff worked from home. [Dkt. No. 60-3, Anderson Dep. Tr. 77:13–78:9].

Plaintiff was initially sent home. At some point thereafter, however, Plaintiff was "asked to come . . . work as an RTS in the" CFTC, along with all of the other TAs at Lawrence Hall. [Dkt. No. 60, ¶ 10]; [Dkt. No. 60-3, Anderson Dep. Tr. 33:22–34:12]. Consequently, although Plaintiff was technically employed as a TA, she worked exclusively as an RTS from the time the school closed in March of 2020 to the date of her termination that November. *See* [Dkt. No. 60-3, Anderson Dep. Tr. 17:8–20].

### 2. *Therapeutic Crisis Intervention ("TCI")*

As Plaintiff's own experience attests, the children in Defendant's care are prone to emotional outbursts, which occasionally turn physical. *See, e.g.*, [*Id.* at 60:4–7] ("They can be very physical. They can be verbally aggressive, physically aggressive, even one on one."); [*id.* at 105:10–14] ("The school was extremely rough. . . . There's an intervention every minute."). The State of Illinois heavily regulates the measures

---

[8]     The statements provided by Gwendolyn Stubblefield, [Dkt. No. 60-2], and Debbie Podmore, [Dkt. No. 60-1], are declarations, because they are unnotarized. Neither is sworn, but both comply with 28 U.S.C. § 1746 and, therefore, may be considered.

Defendant can take in response to such incidents. In particular, regulations set forth "acceptable behavior treatment techniques" to which a child care facility like Defendant is permitted to resort and "assure that these techniques are used only under controlled conditions by appropriately trained personnel." ILL. ADMIN. CODE tit. 89, § 384.10(a). They also "identify limitations and restrictions on specific behavior treatment techniques related to crisis prevention, behavior intervention, and behavior management." *Id.*

To this end, Defendant—as a licensed child care facility and contractor with DCFS—is required to choose a crisis prevention procedure from an appendix of pre-approved models vetted by the State of Illinois. These models are "listed in Appendix A" to Part 384 of Title 89, *id.* § 384.20, and include: (1) a model developed by Crisis Intervention Training Associates (CITA); (2) a model developed by the Crisis Prevention Institute (CPI); (3) The Mandt System; (4) Professional Assault Response Training (PART); and (5) Therapeutic Crisis Intervention (TCI). *See id.* app. A; [Dkt. No. 60-1, Exhibit B, 8–9].

Defendant has chosen the last of those approved behavior management models, Therapeutic Crisis Intervention ("TCI"). [Dkt. No. 60, ¶ 7]; [Dkt. No. 60-1, ¶ 3]; *see generally* [Dkt. No. 60-1, Exhibit A, 3–7]. TCI "provides for violence de-escalation and—"in very limited circumstances"—"the administration of physical restraints." [Dkt. No. 60, ¶ 7.] In order to administer physical restraints, employees must have the ability to "kneel down and rise up from a kneeling position to standing without assistance." [*Id.* at ¶ 8]; [Dkt. No. 60-3, Anderson Dep. Tr. 24:24–25:3].

Defendant requires "[a]ll direct care employees . . . to pass and become certified in the TCI" protocol. [Dkt. No. 60, ¶ 8]. After obtaining an initial certification, direct care employees must re-certify in TCI techniques every six months. [*Id.*] Both the TA and RTS positions are considered direct-care roles, so all TAs and Residential Treatment Specialists are required to certify in TCI, both initially and biannually thereafter. [*Id.* at ¶¶ 8–9]. Because the administration of physical restraints is an important component of TCI, an employee cannot certify or re-certify in TCI unless she demonstrates that she has the physical ability to do so. [*Id.*].

As the job descriptions for both the TA and RTS positions, Defendant considers the ability to administer physical restraints "an essential function" of both the TA and RTS positions. [Dkt. No. 60, ¶ 9]; [Dkt. No. 60-2, Exhibit 1, p. 4] (Teacher Assistants "[m]ust be able to effectively use both verbal and physical intervention skills with individuals six (6) through twenty-one (21) years of age. Physical intervention skills require the ability to kneel and return to standing without assistance."); [Dkt. No. 60-2, Exhibit 2, p. 6] (Residential Treatment Specialists must be able to do the same).

### 3. *FMLA Leave and Termination*

As noted above, sometime after Defendant closed the school, Plaintiff returned to work in the CFTC as a Residential Treatment Specialist. In June of 2020, while working in that role, Plaintiff was "kicked in the knee by a student, which caused severe swelling and inflammation." [Dkt. No. 1, ¶ 11]. Plaintiff had long suffered from Degenerative Joint Disorder ("DJD") and an intervertebral disc disorder, and this

incident caused additional problems. [*Id.* at ¶ 8].[9] It is not entirely clear whether Plaintiff's knee injury merely exacerbated her previous conditions or whether it brought about a new condition.[10]

Whatever the case may be, the incident brought about a complex array of issues afflicting "her left knee and back, including degenerative joint and disk disease," and "sciatica." [Dkt. No. 60, ¶ 11]. By July 3, Plaintiff's medical condition declined to the point she felt compelled to take leave under the FMLA. To do so, Plaintiff had to submit a request for leave to FMLASource, a third-party vendor Defendant employs to help it discharge its obligations under the FMLA. [Dkt. No. 60, ¶ 16]; [Dkt. No. 60-3, Anderson Dep. Tr. 50:22–51:8].

FMLASource granted Plaintiff's request for an initial period of forty-five days, starting on July 3, and ending August 17.[11] [Dkt. No. 60-3, Exhibit 2, p. 172]; [Dkt. No. 60, ¶ 11]. On July 31, Plaintiff put in for additional leave through September 8. [Dkt. No. 60-3, Exhibit 2, p. 169]. FMLASource approved that request on August 10, 2020. [*Id.* at p. 166]. On August 25, 2020, Plaintiff requested an additional two-days

---

[9]   Plaintiff made this disability known to Defendant in 2015, when she was initially hired. [Dkt. No. 1, ¶ 8]; [Dkt. No. 60-3, Anderson Dep. Tr. 30:1–31:13].

[10]   The record does not describe the June 2020 incident in much detail, or link it to Plaintiff's longstanding health issues. Because Defendant concedes that Plaintiff is disabled within the meaning of the ADA, and because Plaintiff has admitted that she was unable to administer physical restraints at the time she was terminated, this lack of detail is not a major issue.

[11]   Plaintiff's complaint alleges that Plaintiff took leave beginning July 2. That date is inconsistent with the date FMLASource provided Plaintiff in several letters in the record. The specific start date is not material because it is undisputed that Plaintiff exhausted her FMLA leave on September 24. [Dkt. No. 60-3, Anderson Dep. Tr. 45:19–47:4].

of leave through September 11, [*id.* at p. 163], which, if approved, would slate Plaintiff for a September 12 return to work. [Dkt. No. 1, ¶ 13].

For reasons not in the record, FMLASource did not approve this request until September 15, several days *after* Plaintiff was scheduled to return to work. [*Id.* at p. 160]. Nonetheless, Plaintiff did not report for work on September 12. To figure out what Plaintiff's plans were, Gwendolyn Stubblefield, a "Human Resources Generalist" at Lawrence Hall, sent Plaintiff an email inquiring when she planned to return to work. [Dkt. No. 1, Exhibit A, p. 33].[12]

Plaintiff responded to Stubblefield the next day. She reported that although she had been examined by her doctor the previous week, she would need to follow up with her for an estimated return-to-work date. [*Id.*]. Later that day, Plaintiff put in for additional leave through October 31,[13] [Dkt. No. 60-3, Exhibit 2, p. 154], and informed Stubblefield that her physician had given her an October 31 return-to-work date. [Dkt. No. 1, Exhibit A, p. 32]. It is undisputed that Plaintiff's FMLA leave was set to exhaust on September 24, more than a month before Plaintiff's return-to-work date. [Dkt. No. 60-3, Exhibit 2, p. 154]; [*Id.*, Anderson Dep. Tr. 45:19–47:4].

---

[12]  Plaintiff's email correspondence with Stubblefield is attached as Exhibit A to her verified complaint. [Dkt. No. 1, Exhibit A, pp. 13–59]. Stubblefield has acknowledged the authenticity of these emails. [Dkt. No. 60-2, ¶ 5]. The Stubblefield correspondence is also attached as an exhibit to Defendant's Local Rule 56.1 statement of facts. [Dkt. No. 60-3, Exhibit 4, pp. 202–48]. For the sake of brevity, when the Court references an email, it will cite to the complaint only.

[13]  Plaintiff's complaint states that "Anderson's FMLA leave was extended by her doctor to October 31, 2020." [Dkt. No. 1, ¶ 14]. A physician, of course, does not have the power to extend an employee's FMLA leave. Such approval can come only from the employee's employer.

18

FMLASource notified Stubblefield later that day that Plaintiff was seeking more leave than the FMLA provides, at which point Stubblefield explained to Plaintiff via email that although Defendant could give her "additional time" off, it would "not be able to hold [her] position until" October 31. [Dkt. No. 1, Exhibit A, p. 31]. This was in line with Defendant's general policy towards FMLA. According to Stubblefield, Defendant "does not allow extended leaves of absence after an employee exhausts their FMLA time except for a few additional weeks if the employee can return to work shortly." [Dkt. No. 60-2, ¶ 11].

In response, Plaintiff disclosed to Stubblefield that she was no longer "sure that [she could] perform as an RTS or Teacher['s] Assistant." [Dkt. No. 1, Exhibit A, p. 30–31]. Plaintiff reported that she was unable to "run after" or "chase" children, "walk up and down stairs," or "walk for that long." [*Id.*]. In light of these restrictions, she felt unable to return to her prior position and asked whether "thought [had] been given" to the possibility of reassigning her to "another position" that would not require her "to engage with children." [*Id.*]

Plaintiff's FMLA leave expired on September 24. *See* [Dkt. No. 60-3, Anderson Dep. Tr. 46:24–47:4]. It is not entirely clear what happened with Plaintiff's request for leave through October 31. The record suggests that it was partially granted—through September 24—and partially denied, to the extent it sought more leave than provided by statute. *See* [Dkt. No. 60-3, Exhibit 2, p. 148]. Notwithstanding that apparent denial, Plaintiff put in an additional request for leave through November 23, which FMLASource denied on October 1. [Dkt. No. 60-3, Exhibit 2, p. 150].

This explains why, on September 30, Plaintiff emailed Stubblefield to inquire whether Defendant "had made a decision [on] granting an extension" through "11/23/2020." [Dkt. No. 1, Exhibit A, p. 39]. Stubblefield responded with the following:

> I hope you are getting better and sorry to hear that your time will be extended out much farther than the original date we were given which was 10/31/2020. I haven't received anything from FMLA or your doctors to state the new date that you are giving us today. Your time had exhausted from FMLA on 9/24/2020 which concluded your 12 weeks of FMLA job protection.
>
> You are requesting that the agency provide an additional 2 months of job security in which at this point I don't believe will be an option. The agency generally will allow individuals additional time within a responsible timeframe of 1 to 2 weeks and having an actual return date in writing from that doctor. We as an agency also have to look at the needs of the program to make a decision like that. I have added Beth onto this email so she is aware of your request and will be able to give you a final decision on your request.

[Dkt. No. 1, Exhibit A, pp. 37–38]; *see also* [Dkt. No. 1, ¶ 18]. The email's reference to "Beth" is to Beth Wilbarger. Wilbarger's position at Lawrence Hall is unclear. In any case, Wilbarger informed Plaintiff that an extension through November 23 would not be granted. [Dkt. No. 1, Exhibit A, p. 37].

In response to Wilbarger's email, Plaintiff asked whether "there [was] another position available that does not require direct child care?" [*Id.*]. Wilbarger responded that she could not "answer that until" she saw "what [Plaintiff's] restrictions are." [*Id.*]. Plaintiff told Wilbarger that she would ask her physician to fill out the necessary forms. [*Id.* at 36].

On October 20, Stubblefield emailed Plaintiff to ask when her physician was "planning to send the documentation." [*Id.* at 57]. Defendant had yet to receive either

a return-to-work date or "anything letting [it] know the restrictions [Plaintiff] would be on if released to return . . . ." [*Id.*] Later that day, Plaintiff sent Defendant a doctor's note from a recent telehealth visit that provided a tentative return-to-work of November 23, subject to the following restrictions: "no lifting, pushing, pulling > 10 lbs, no prolonged sitting, standing, walking >20 minute intervals." [Dkt. No. 1, Exhibit A, p. 20]; [Dkt. No. 60, ¶ 13]. She also stressed that Plaintiff "[n]eeded frequent position change to prevent reaggravation. [Dkt. No. 1, Exhibit A, p. 20]; [Dkt. No. 60, ¶ 13].

Defendant received all necessary documentation from Plaintiff's physician by October 26. [Dkt. No. 1, ¶ 19]. That day, in response to an email from Plaintiff seeking confirmation that Defendant had everything it needed, Stubblefield informed Plaintiff that Wilbarger was actively "checking . . . to see if we are able to find a position within the agency that will be able to accommodate your restrictions." [Dkt. No. 1, Exhibit A, p. 40]. Stubblefield also asked Plaintiff "how long" she would "have to be on [the] restrictions" given by her physician. [*Id.*] Plaintiff responded that she "could ask the doctor to send an additional note" clarifying the "time length." [*Id.* at p. 44]. During her deposition, Plaintiff stated that her restrictions were "permanent." [Dkt. No. 60-3, Anderson Dep. Tr. 64:14–65:2].

On November 5, Stubblefield emailed Plaintiff to offer her a job as a medical driver. [Dkt. No. 1, Exhibit A, p. 15]. According to the job description for that position, a medical driver "[p]rovides supervision and transportation of Lawrence Hall residents to and from health care providers in [an] agency vehicle/van." [Dkt. No. 60-

2, Exhibit 4, pp. 11–12]. Stubblefield acknowledged, however, that this position did not entirely accommodate Plaintiff's restrictions and that she would need to consult with her physician to see whether some of her restrictions could be "dropped or decreased." [Dkt. No. 1, Exhibit A, p. 15].

Plaintiff expressed her thanks for the opportunity but felt that the position would not be a good fit for her. [*Id.* at 14]. She explained that some kind of "administrative" position would be the best option given the circumstances, particularly in light of her education level and physical restrictions. [*Id.*] Plaintiff asked Stubblefield about a contact tracer position she had recently applied for on Defendant's website. [*Id.* at 14]; [Dkt. No. 60-3, Anderson Dep. Tr. 61:2–62:9].

The contact tracer position was grant funded, and the terms of that grant included restrictions on who Defendant could hire. [Dkt. No. 60-2, ¶ 8]. As relevant here, the grant limited the pool of eligible applicants to those residing in certain Chicago neighborhoods. [*Id.*] Plaintiff was not eligible, and, in any case, the position was "filled prior to the end of October 2020," before Plaintiff requested that position. [*Id.* at ¶¶ 8–9]. Accordingly, Stubblefield informed Plaintiff that the position was unavailable, and Plaintiff told Stubblefield in response that she would see her physician the next week and get a "firm answer" on whether she could take the Medical Driver position. [Dkt. No. 1, Exhibit A, p. 13].

Plaintiff was ultimately unable to accept the Medical Driver position, and—having identified no position that Plaintiff could fill—Defendant terminated

Plaintiff's employment on November 16, 2020. [Dkt. No. 60-3, Anderson Dep. Tr. 57:23–58:1]; [Dkt. No. 60, ¶¶ 3, 22].

## II.   **Legal Standard**

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is material if its determination by the trier of fact "might affect the outcome of the suit under the governing law . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute with respect to such a fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

If, "after adequate time for discovery," the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). In that situation, the movant is "'entitled to a judgment as a matter of law,'" provided the movant has satisfied its "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of" the record "which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.

A court's "function" at this stage "is not . . . to weigh the evidence and determine the truth of the matter," but rather to determine "whether a fair-minded jury could

return a verdict for the [non-movant] on the evidence presented." *Anderson*, 477 U.S. at 249, 252. In conducting this inquiry, courts must "view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Holloway v. City of Milwaukee*, 43 F.4th 760, 765 (7th Cir. 2022). Nevertheless, not all inferences are reasonable, and "speculation" unsupported by concrete evidence, cannot "create a genuine issue of fact for the purposes of summary judgment." *Consolino v. Towne*, 872 F.3d 825, 830 (7th Cir. 2017); *Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012).

III.  **Analysis**

  A.  **Americans with Disabilities Act**

"The ADA provides that a covered employer shall not 'discriminate against a qualified individual with a disability because of the disability of such individual.'" *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 796 (7th Cir. 2005) (quoting 42 U.S.C. § 12112(a)). The statute expressly defines "discrimination" to include, among other things, an employer's failure to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless" doing so "would impose an undue hardship on the operation of" the employer's business. 42 U.S.C. § 12112(b)(5)(A). "Thus, the ADA requires employees to reasonably accommodate the limitations of its disabled employees." *Sears, Roebuck & Co.*, 417 F.3d at 797.

To make out a *prima facie* failure-to-accommodate claim, a plaintiff must prove that "(1) she is a qualified individual with a disability; (2) the employer was aware of

her disability; and (3) the employer failed to reasonably accommodate the disability."
*Kotwica v. Rose Packing Co.*, 637 F.3d 744, 747–48 (7th Cir. 2011) (quoting *Sears, Roebuck & Co.*, 417 F.3d at 797). The first of these elements can be broken down further into two distinct issues—whether an employee is disabled and whether an employee is a qualified individual.

There is no dispute in this case that Plaintiff is disabled within the meaning of the ADA. There is also no dispute that Defendant was aware of that disability. Defendant instead moves for summary judgment on the ground that Plaintiff was not a "qualified individual" on the date of her termination and, therefore, was not entitled to an accommodation.[14] [Dkt. No. 59, 5]. Because Plaintiff "bears the burden of proof on this issue," to survive summary judgment, she must "come forward with evidence" that would permit a reasonable jury to conclude that she is "a 'qualified individual'" under the statute. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 564 (7th Cir. 1996); *see also Celotex Corp*, 477 U.S. at 322–23.

An employee is a "qualified individual" under the ADA if she "can perform the essential functions of the employment position that such individual holds or desires," "with or without reasonable accommodation." 42 U.S.C. § 12111(8). The ADA's

---

[14] Plaintiff's filings appear to misunderstand the nature of Defendant's argument that she is not a "qualified individual" under the ADA. *See* [Dkt. No. 65, 1]. To rebut that charge, Plaintiff points to the fact that Blue Cross Blue Shield—through which Plaintiff apparently received long term disability—considered her disabled. [*Id.*] ("Plaintiff was disqualified for two years by Long term Disability Blue Cross Blue Shield."). She also points to the Social Security Administration's "validation of verified disability," [*id.*], and the fact that Dearborn National—through which she received short term disability—likewise considered her disabled. [*Id.* at 2]. But Defendant has never suggested that Plaintiff is not disabled. As the court will explain, whether an employee is "qualified" is entirely separate from the question of whether she is disabled.

implementing regulations define "essential function" as the "fundamental job duties of the employment position the individual with a disability holds or desires," 29 C.F.R. § 1630.2(n)(1). They clarify further that "[t]he term 'essential functions' does not include the marginal functions of [a] position." *Id.*

Both the statutory definition of "qualified individual" and the regulatory definition of "essential function" are general. Helpfully, the regulations do offer a non-illustrative list of reasons why a given task might be essential. *See* 29 C.F.R. § 1630.2(n)(2). First, a "function may be essential because the reason the position exits is to perform that function." *Id.* § 1630.2(n)(2)(i). Second, it may be deemed essential "because of the limited number of employees available among whom the performance of that job function can be distributed." *Id.* § 1630.2(n)(2)(ii). Finally, it might be essential because it is "highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function." *Id.* § 1630.2(n)(2)(iii).

Whether a given task is an essential function is ultimately a "factual question, *not* a question of law." *Tate v. Dart*, 51 F.4th 789, 794 (7th Cir. 2022) (quoting *Brown v. Smith*, 827 F.3d 609, 613 (7th Cir. 2016)) (emphasis original to *Brown*). The regulations "identify seven non-exclusive categories of evidence" relevant to this determination, *Tate*, 51 F.4th at 794, including:

> (i) The employer's judgment as to which functions are essential;
>
> (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
>
> (iii) The amount of time spent on the job performing the function;

(iv)  The consequences of not requiring the incumbent to perform the function;

(v)  The terms of a collective bargaining agreement;

(vi)  The work experience of past incumbents in the job; and/or

(vii)  The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3).

"A 'reasonable accommodation' is one that allows the disabled employee to 'perform the essential functions of the employment position.'" *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 481 (7th Cir. 2017) (quoting 42 U.S.C. § 12111(8)). If no accommodation would enable an employee to perform the essential functions of her position, she is not a qualified individual under the statute and not entitled to accommodation within that position. *Id.* Nevertheless, the ADA makes clear that even if an employee is not a qualified individual with respect to the job that she holds, she may nonetheless be a qualified individual with respect to another position—one that she "desires." 42 U.S.C. § 12111(8).

Accordingly, the statute recognizes that "[t]he term 'reasonable accommodation' may include . . . reassignment to a vacant position," provided—as always—that the employee can perform the essential functions of *that* position with or without further accommodation. 42 U.S.C. § 12111(9) & (9)(B); *see also Severson*, 872 F.3d at 482 ("Reassignment to a vacant position may be a reasonable accommodation under the statute."); *Ozlowski v. Henderson*, 237 F.3d 837 (7th Cir. 2001) ("Reassignment to a vacant position is a form of reasonable accommodation.").

27

Because reassignment can—indeed, often will—constitute a reasonable accommodation under the statute, employers are generally required to at least "consider" whether there are "any position[s] for which the employee satisfies the employer's legitimate, nondiscriminatory prerequisites, and for which the employee is capable of performing the alternative job's essential functions, with or without reasonable accommodations." *DePaoli v. Abbott Lab'ys*, 140 F.3d 668, 675 (7th Cir. 1998). But this obligation has limits. It extends "'only to vacant positions; an employer is not required to 'bump' other employees to create a vacancy so as to be able to reassign the disabled employee. Nor is an employer obligated to create a 'new' position for the disabled employee.'" *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 291 (7th Cir. 2015) (quoting *Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir. 1996)).

A plaintiff claiming that her employer unlawfully failed to reassign her to a different position bears the burden—both at summary judgment and at trial—to prove that a position was vacant and, hence, "available," "at the time of [her] termination." *Severson*, 872 F.3d at 482; *Ozlowski*, 237 F.3d at 840; *Kotwica*, 637 F.3d at 750. Timing is supremely important here—that a job was vacant before or after the plaintiff was terminated does not necessarily show that it was available at the time of termination. To survive summary judgment, a plaintiff must come forward with evidence—not "'speculation or conjecture'"—upon which a reasonable jury could conclude that an alternative position was available at the time of termination. *Harper*, 687 F.3d at 306 (quoting *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008)). Anything less is insufficient.

28

With these principles in mind, the Court considers a slew of accommodations Plaintiff claims she could have been provided short of termination. Those accommodations can be divided into three categories: (1) those Plaintiff claims would have allowed her to fulfill the essential functions of her previous jobs as a TA and occasional RTS; (2) alternative positions to which Defendant allegedly could have reassigned her; and (3) placement on light-duty status.

1.    *TCI without Restraints*

Plaintiff first argues that Defendant should have permitted her to continue to work as a TA or RTS, without requiring her to administer physical restraints. [Dkt. No. 66, 4–5] ("There is no doubt that the defendant refused to offer job modification; TCI without restraint."). This argument—that ADA *required* Defendant to excuse Plaintiff from the physical restraint portion of its TCI behavior management model—challenges Defendant's assertion that the ability to administer physical restraints is an essential function of the TA and RTS positions. *See* [Dkt. No. 59, 3] ("Both the position of Teacher's Assistant and RTS required physical intervention skills as part of TCI, that involved the ability to kneel and return to standing without assistance."); [Dkt. No. 60, ¶ 14] ("Physical restraints are an essential function of both job positions held by Plaintiff").

In support of this argument, Plaintiff emphasizes that not all of Defendant's employees are required to administer restraints. For example, she points to the fact that "new hires" are temporarily permitted to work "on the units"—presumably a reference to the residential units in the CFTC—before "they are TCI qualified," and,

therefore, before they are authorized to administer restraints. [Dkt. No. 65, 2]; *see also* [*id.* at 3] ("Human Resources Specialist and certainly the VP of Human Resources has knowledge of allowable employment modifications; no restraint and on the Units as done by new hires.").

Plaintiff argues that her "job duties could have been modified" similarly. [Dkt. No. 65, 2–3]. There are three problems with this argument. First, Plaintiff's claim that new hires are permitted to work in the CFTC without the capacity to administer restraints is not supported by any evidence in the record.[15] And as the Court discussed at length above, Plaintiff cannot inject these facts into the record through her unsworn filings.

Second, even if the Court could consider those facts, the fact that Defendant temporarily exempts new hires from the physical restraint requirement does not mean that the ability to administer restraints is not an essential function of the TA and RTS positions. After all, all new hires are eventually required to certify in TCI and demonstrate their ability to administer restraints. In any case, Plaintiff's

---

[15]     Plaintiff testified at her deposition that there are two kinds of TCI—"TCI with restraint" and "TCI without restraint." [Dkt. No. 60-3, Anderson Dep. Tr. 80:24–81:2]. But this is completely consistent with Defendant's assertion that all direct-care employees are required to administer restraints. A look at Defendant's certification policy demonstrates that that although some employees were permitted to certify in a form of TCI that did not involve physical restraints, this depended entirely on the nature of the position held. [Dkt. No. 60-1, Exhibit C, 12] ("The Agency requires varying level of certification based on department/position . . . ."). Administrative staff, for instance, who lack the same kind of direct supervisory relationship to the children in Defendant's care as TAs or Residential Treatment Specialists are not required to certify in TCI—general de-escalation training suffices. That Defendant did not require employees in some positions to administer physical restraints does not mean that the ability to do so is not an essential function of a different position, with different responsibilities.

proposed accommodation sweeps far more broadly than the temporary exemption enjoyed by new hires—the exemption she proposes would be permanent.

Finally, looking to the seven categories of evidence identified by 29 C.F.R. § 1630.2(n)(3), the evidence in the record fully supports Defendant's assertion that the ability to administer restraints is an essential function of the TA and RTS positions. First, Defendant's "judgment" that the ability to administer restraints is an essential function is entitled to some a "degree of deference." *Tate*, 51 F.4th at 794. Second, the job descriptions for both positions—which were created before Plaintiff occupied either position, [Dkt. No. 60-2, ¶¶ 6–7]—both expressly state that applicants "[m]ust be able to effectively use . . . physical intervention skills with individuals six (6) through twenty-one (21) years of age," which "require[s] the ability to kneel and return to standing without assistance." [*Id.*, Exhibits 1 and 2, pp. 4, 6].

The "reality on the ground" underscores the importance that direct-care employees be able to administer restraints. *Tonyan v. Dunham's Athleisure Corp.*, 966 F.3d 681, 688 (7th Cir. 2020); *see also* 29 C.F.R. § 1630.2(n)(3)(iii)–(iv), (vi). Plaintiff's deposition testimony makes clear that physical intervention was commonplace. As Plaintiff remembered things at her deposition, "[t]he school was extremely rough . . . There's an intervention every minute." [Dkt. No. 60-3, Anderson Dep. Tr. 105:10–14]. In light of this practical reality, Defendant's requirement that all direct-care employees have the ability to administer physical restraints, if necessary, appears eminently reasonable.

In *Tate v. Dart*, the Seventh Circuit recognized that "where [a] job includes emergency response duties," those duties can be essential even if "performed only rarely." 51 F.4th at 795–96. In so holding, the Court stressed that although the consequences of an employee's inability to fully respond to an emergency "could be innocuous, . . . they could also be grave." *Id.* at 797. So too here. Because the record amply supports Defendant's judgment that the ability to administer physical restraints is essential, and because Plaintiff has not come forward with any evidence calling that judgment into question, the Court holds that the ability to administer restraints is, in fact, an essential function of the TA and RTS positions. Because Plaintiff concedes that she was physically unable to do this at the time of her termination, [Dkt. No. 60-3, Anderson Dep. Tr. 24:4–26:12], she was not a "qualified individual" with respect to that position and this theory of ADA liability must fail.

### 2. *Reassignment to New Positions*

Plaintiff next argues that even if she could not perform the essential functions of her previous positions as a TA and RTS, there are positions to which she could have been reassigned. Plaintiff's filings identify four possibilities: (1) contact tracer; (2) medical assistant; and (3) medical secretary/transcriptionist; and (4) school secretary. As the Court noted above, it is Plaintiff's burden to prove—through more than mere speculation or conjecture—that one of these positions was "vacant . . . at the time of [her] termination." *Severson*, 872 F.3d at 482.[16] Because Plaintiff has failed to do so, each of her reassignment theories falls short.

---

[16]     Throughout her filings, Plaintiff takes issue with the suggestion that she must identify accommodations for which she was eligible at the time of her termination. [Dkt. No.

The Court begins with Plaintiff's argument that she should have been offered a job as a contact tracer. [Dkt. No. 65, 1–2]. Recall that Plaintiff applied for this grant-funded position sometime around November 5. Plaintiff has come forward with no evidence to dispute either Defendant's assertion (1) that the position was "filled prior to the end of October 2020," before Plaintiff "requested" it, or its assertion that (2) Plaintiff did not qualify for the position under the terms of the Chicago Workforce grant through which it was funded. [Dkt. No. 60-2 at ¶¶ 8–9]; [Dkt. No. 60, ¶ 21].

Because Plaintiff offers nothing to rebut this evidence, this theory of liability fails for either of two independent reasons. First, because the position was filled before Plaintiff requested it, it was never available to Defendant as an accommodation. Defendant cannot be faulted for failing to reassign Plaintiff to an occupied position. Doing so would have required Defendant to "bump" the employee who held that position when employers have no such obligation. *Stern*, 788 F.3d at 291. Second, even if the position was available, nothing in the ADA would have required Defendant to disregard the terms of the Chicago Workforce grant, compliance with which, under the circumstances, is a "'legitimate nondiscriminatory prerequisite'" for the position. *Gile*, 213 F.3d at 374.

Next, Plaintiff claims that Defendant was "in need of nurses," and that, given her extensive training and experience as a Medical Assistant, she could have "substitut[ed]" for a nurse. [Dkt. No. 65, 3–4]. Plaintiff discusses this alleged nurse

---

66, 1] ("[P]laintiff should not have to perform the job as HR Specialist or . . . to be in tune[] with Program needs as [if] I were a managerial staff."). The Court takes Plaintiff's point, but ultimately, it is Plaintiff's burden to prove her case.

shortage for the first time in her summary judgment filings—there is simply nothing in the record backing it up. Consequently, this argument is completely unsupported and fails for lack of evidence.

Even if the record did support Plaintiff's claim that Defendant suffered from a nurse shortage, that fact alone would not permit a reasonable jury—without more—to find that she was qualified to substitute for a nurse by virtue of her Medical Assistant training. It is her burden, after all, to "to provide evidence [that could] persuade a rational factfinder that she [could] perform [that] job's essential functions." *Kotaska v. Fed. Express Corp.*, 966 F.3d 624, 630 (7th Cir. 2020). The record does not even attempt to identify what those functions might be, and given the fact that nursing requires specialized education and training, Plaintiff's suggestion that she could substitute for a nurse is sheer speculation.

Third, Plaintiff argues that Defendant could have hired her to do transcription, like she had done as a Medical Secretary before that position was eliminated in late 2018. In support of this argument, Plaintiff emphasizes that even after the Medical Secretary position was eliminated, she continued to provide transcription services on the side. [Dkt. No. 64, 6] ("I, the plaintiff performed clerical duties as an overtime position at Lawrence Hall's medical department as Transcriptionist."); [Dkt. No. 65, 2] ("As the previous Medical Secretary, I still worked as Defendant['s] transcription as an over time position. Transcribing is a job possibly plaintiff could have performed until another position opened."); [Dkt. No. 65, 4] (stating that after the Medical Secretary position was eliminated, "Plaintiff continued to assist th[e medical]

department with transcribing psychiatric notes for Dr. Friedman."); [Dkt. No. 66, 5] ("There were over time position Ms. Anderson could have performed as plaintiff were performing at least two or three times a week transcribing.").

This argument is supported by some deposition testimony, though only of the most general kind. During her deposition, Plaintiff testified that she provided "medical transcription" to Defendant at unspecified times. [Dkt. No. 60-3, Anderson Dep. Tr. 82:2–5]. The record does not provide any additional information on the transcription work Plaintiff did for Defendant. It does not speak to the frequency of the work, whether transcription was a standalone position, or whether the work was exclusively done by Plaintiff or was something for which another employee bore primary responsibility. The Court cannot consider details introduced for the first time in Plaintiff's filings, like the assertion that she transcribed "two or three times a week." [Dkt. No. 66, 5]. On the record properly before the Court, no rational factfinder could infer from Plaintiff's isolated remark (1) that a transcriptionist position existed; and (2) that that position was vacant when Plaintiff was terminated. The mere fact that Plaintiff transcribed at some unspecified time for Defendant is insufficient to support either conclusion. To draw either conclusion would be wholly speculative in the absence of additional information.[17]

Plaintiff's fourth and final argument is that "there [was] a secretarial position open" at the school that she could have filled. [Dkt. No. 64, 6]. Plaintiff briefly

_____

[17]    One of Plaintiff's filings suggests that Plaintiff raises transcription not as a full-time position she should have been offered but rather as an example of light-duty work she could have completed until another job opened up. [Dkt. No. 66, 5]. If this is Plaintiff's position, it fails for reasons discussed below.

discussed this position during her deposition, recalling that the previous "secretary for the school had . . . quit" and that that position "was open." [Dkt. No. 60-3, Anderson Dep. Tr. 73:16–20]. Plaintiff did not otherwise explain the basis for her knowledge that the position was "open," or when the previous secretary "quit."

On closer examination, the basis for Plaintiff's knowledge that the school secretary position was open and available at the time of her termination falls apart. Recall that Defendant shut down both its school and administrative building from March 2020 "beyond the end of 2020." [Dkt. No. 60-2, ¶¶ 3, 10]. When asked whether she knew that Defendant needed a school secretary during this time, Plaintiff responded that she did not know. [Dkt. No. 60-3, Anderson Dep. Tr. at 73:21–74:8]. From the Court's perspective, this information seems to be the type that would have been unearthed during discovery. But Plaintiff cannot now fill this gap with speculation or conjecture. In light of the fact that the school was shut down at the relevant time, a rational jury could not simply assume—on the basis of nothing more than Plaintiff's non-specific recollection that the previous secretary had "quit" and the position unfilled—that Defendant was actively hiring for the position.

Plaintiff's personal knowledge extends only to the fact that (1) the position existed; (2) that the previous secretary quit; and (3) that the position was not filled. It does not, however, extend to whether Defendant was actively seeking to fill it while the school remained closed. Without evidence bearing on the latter question, no reasonable jury could find that the secretarial position was available when Plaintiff was terminated. Nothing in the ADA obligates an employer to fill a position for which

it no longer has a need—whether permanently or temporarily. For these reasons, all of Plaintiff's reassignment-based theories of ADA liability fail.

### 3. *Temporary Light Duty and Administrative Duty*

Finally, Plaintiff argues that she should have been "given an opportunity to return to work in a light duty status." [Dkt. No. 64, 9].

In support of this argument, Plaintiff points to numerous other employees she believes were preferentially treated by Defendant. Those employees fall into three categories:

- Two employees who were allegedly "put on light duty/administrative duty" while under DCFS investigation, [Dkt. No. 64, 6], [Dkt. No. 67, 2–3], [Dkt. No. 69, 1];

- Numerous employees who were allegedly "allowed to return with either modified duties or full duty in their previous position" after taking FMLA leave, [Dkt. No. 73, 1–2], [Dkt. No. 69, 1–2], [Dkt. No. 68, 1–2], [Dkt. No. 67, 3]; and

- Defendant's administrative staff, which Defendant permitted to work from home during the Covid-19 pandemic, while the administrative building was closed. [Dkt. No. 66, 1], [Dkt. No. 67, 3]; [Dkt. No. 73, 1–2].

Most of Plaintiff's examples do not actually involve light or administrative duty. Plaintiff takes issue with the fact that Defendant permitted its administrative staff to work from home during the COVID-19 pandemic, [Dkt. No. 60-3, Anderson Dep. Tr. 77:13–78:9], but points to no evidence that administrative functions could not be performed remotely.[18] Working from home is not the equivalent of light or

---

[18]     Plaintiff takes special aim at a receptionist named Jemmerio Davis. Plaintiff speculates that Davis "[p]robably . . . wasn't" doing his job during the time he was permitted to work from home. [Dkt. No. 60-3, Anderson Dep. Tr. 77:13–78:9]. This is sheer speculation without any foundation in personal knowledge.

administrative duty. Moreover, although Plaintiff points to a number of employees permitted to return to their positions after taking FMLA leave, she does not allege that any of them were unable to perform the essential functions of those positions or were permitted to take more leave than Defendant allowed Plaintiff.[19]

The only two employees Plaintiff claims were offered light-duty positions are Tom Grossman and Lowell "Terry" Allen. [Dkt. No. 67, 2–3]. Plaintiff claims that Defendant permitted those employees to perform light-duty work while under DCFS investigation. Plaintiff does not say how long these investigations took, but contends that Defendant violated the ADA by not placing her on light-duty status as well. This argument fails for a number of reasons, first and foremost being the fundamental difference between offering light-duty work to an employee under temporary investigation and what Plaintiff has admitted she would have needed—an indefinite light-duty position.

During her deposition, Plaintiff acknowledged that her condition had not substantially improved from the date of her termination through the date of her

---

[19]     Plaintiff gives four examples of employees she believes were treated preferentially— (1) a nurse permitted to return to her previous position after taking "a number of months of" after a mental health incident, [Dkt. No. 68, 1]; (2) one Byron Smith who was "out for quite some time after becoming ill at work" and permitted to return with accommodations, [Dkt. No. 68, 2]; (3) one "Mr. Grossman" who was "physical ill" and "granted excessive time" off before returning to work "with job modifications," [Dkt. No. 69, 1–2]; and (4) one Patricia Jones, who was "off sick" and had her "position[] held." [Dkt. No. 69, 3]. Plaintiff has not come forward with evidence that any of these employees was unable to perform the essential functions of their job, with or without accommodation, upon return. Furthermore, although Plaintiff takes issue with the fact that many employees were allowed to take long periods of leave, she has not come forward with any evidence showing how long any particular employee's position was held. The FMLA itself guarantees three months. When personal time is factored in, along with Defendant's policy of holding positions for short periods of time after FMLA is exhausted, [Dkt. No. 60-2, ¶ 11], it is impossible to conclude that any of these employees was treated differently from Plaintiff.

deposition and that, in all likelihood, it will be permanent. [Dkt. No 60-3, Anderson Dep. Tr. 85:8–86:22]. Plaintiff also agreed with Defendant's counsel that had "Lawrence Hall . . . provided [her] with a position involving light duty," she "would still be on that light-duty position today." [*Id.* 75:10–19]. By Plaintiff's own admission, then, she is not seeking the kind of temporary light-duty accommodation allegedly received by Grossman or Allen, but something far more permanent.

As a general matter, employers have no duty under the ADA to "create a light duty position" to accommodate a disabled employee. *Severson*, 872 F.3d at 482. The EEOC has recognized a limited exception to that rule where an employer "has a policy of creating light-duty positions for employees who are occupationally injured." *Id.* (citing *EEOC Enforcement Guidance: Workers' Compensation & the ADA*, 2 EEOC Compliance Manual (CCH) ¶ 6905, at 5394 (Sept. 3, 1996), 1996 WL 33161342, at *12. In that case, the employer must ordinarily extend "that same benefit . . . to an employee with a disability who is not occupationally injured unless the company can show undue hardship." *Id.*

Even assuming the ADA would similarly require an employer who has a policy of creating light-duty positions for employees who are under temporary investigation, both EEOC guidance and Seventh Circuit precedent make clear that nothing in the ADA requires an employer to transform a temporary light duty position into a permanent one. *EEOC Enforcement Guidance*, 1996 WL 33161342, at *14; *Watson v. Lithonia Lighting*, 304 F.3d 749, 752 (7th Cir. 2002) ("We conclude that the ADA does not require an employer that sets aside a pool of positions for recovering employees

to make those positions available indefinitely to an employee whose recovery has run its course without restoring that worker to her original healthy state.").

Assuming arguendo (1) that Plaintiff's deposition testimony is sufficient to permit a reasonable jury to find that Defendant has a policy of accommodating personnel under investigation with temporary light-duty status, and (2) that the ADA required Defendant to extend the same benefit to Plaintiff, her theory of liability still fails because Plaintiff is not seeking temporary light-duty status. She seeks precisely the kind of accommodation the Seventh Circuit rejected as unreasonable in *Watson*.

Having considered and rejected all of Plaintiff's proposed accommodations as a matter of law, the Court holds that no reasonable jury could find that Plaintiff was a "qualified individual" under the ADA. Defendant is therefore entitled to summary judgment on Plaintiff's ADA claims.

B. **Family and Medical Leave Act**

That just leaves Plaintiff's claims of interference and retaliation under the FMLA. [Dkt. No. 1, ¶¶ 40–48]. "The FMLA entitles any eligible employee suffering from a serious health condition that renders [her] unable to perform the functions of [her] position to twelve workweeks of leave during each twelve-month period." *Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006); *see* 29 U.S.C. § 2612(a)(1) & (a)(1)(D). "After the period of qualified leave expires, the employee is entitled to be reinstated to [her] former position or an equivalent one with the same benefits and terms of employment that existed prior to the exercise of the leave." *King v. Preferred Technical Grp.*, 166 F.3d 887, 891 (7th Cir. 1999); *see* 29 U.S.C. § 2614(a).

40

To safeguard these substantive guarantees, the FMLA prohibits covered employers from "(i) interfering with, restraining, or denying the exercise of FMLA rights," including the right to reinstatement; and from "(ii) discriminating or retaliating against employees for exercising FMLA rights." *Ziccarelli v. Dart*, 35 F.4th 1079, 1084 (7th Cir. 2022); *see* 29 U.S.C. § 2615(a)(1) & (2). Plaintiff alleges that Defendant violated both.

The Court begins with Plaintiff's claim that Defendant interfered with her efforts to exercise rights under the FMLA. "An employee claiming FMLA interference must show that: (1) [s]he was eligible for FMLA protections; (2) [her] employer was covered by the FMLA; (3) [s]he was entitled to take leave under the FMLA; (4) [s]he provided sufficient notice of [her] intent to take leave; and (5) [her] employer 'interfered with, restrained, or denied FMLA benefits to which [s]he was entitled.'" *Juday v. FCA US LLC*, 57 F.4th 591, 595 (7th Cir. 2023) (quoting *Ziccarelli*, 35 F.4th at 1089)). Only the fifth element is at issue in this case.

Defendant argues that it is entitled to summary judgment for two reasons: *first*, because Plaintiff has adduced no evidence of any kind that Defendant impeded her in the taking of leave; and, *second*, that it did not interfere with Plaintiff's presumptive right to reinstatement because she was not qualified to return—either as a TA, RTS, or in any other "equivalent" position. [Dkt. No. 59, 6]; [Dkt. No. 70, 6].

As for the first argument, Defendant is correct that the record is completely devoid of evidence showing that Defendant—either itself or through FMLASource— took any action that could even arguably amount to an attempt to interfere with or

otherwise discourage Plaintiff from taking leave under the statute. To the contrary, the evidence shows that FMLASource promptly approved all of Plaintiff's requests for leave, except when those requests sought more than the twelve weeks available by statute. On this record, no reasonable jury could find that Defendant interfered with Plaintiff's efforts to take leave.

With respect to reinstatement, Defendant is also correct that because Plaintiff was unable to administer physical restraints, "an essential function" of both the TA and RTS positions, Plaintiff was not entitled to reinstatement under the FMLA. 29 C.F.R. § 825.16(c). As the Seventh Circuit explained in *James v. Hyatt Regency Chicago*,

> [t]he FMLA only requires that an employer permit an employee to take up to twelve weeks of unpaid leave for illness and return to his prior post or an equivalent position. . . . Employers are under no obligation to restore an employee to his or her position if the employee is unable to perform the essential functions of the job.

707 F.3d 775, 781 (7th Cir. 2013); *see also Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 223 (7th Cir. 2015). So too here. Because Plaintiff was unable to perform the essential functions of either the TA or RTS positions, she had no right to reinstatement.

Which just leaves Plaintiff's retaliation claim. Retaliation under the FMLA can be proven "under the direct or indirect methods of proof." *Burnett v. LFW Inc.*, 472 F.3d 471, 481 (7th Cir. 2006). Plaintiff has not expressly chosen to proceed under either approach. "Where 'a plaintiff eschews burden-shifting and presents direct and circumstantial evidence in opposition to an employer's motion for summary

judgment,'" courts "typically use the direct method as the 'default rule.'" *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 880 (7th Cir. 2016) (quoting *Morgan v. SVT,* LLC, 724 F.3d 990, 997 (7th Cir. 2013)).[20] The Court will therefore examine Plaintiff's claim under the direct method only.

"To prevail on a claim for retaliation" under the direct method, "a plaintiff must show that (1) [s]he engaged in FMLA-protected activity; (2) [her] employer took an adverse employment action against [her]; and (3) there is a causal connection between the two." *Juday*, 57 F.4th at 596. This requires "proof of discriminatory intent— evidence that the employer 'was acting under a prohibited animus.'" *Id.* "A plaintiff can prevail under the direct method by showing an admission of discrimination or by 'constructing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker.'" *Scruggs v. Carrier Corp.*, 688 F.3d 821, 827 (7th Cir. 2012) (quoting *Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 771 (7th Cir. 2008)).

By taking leave under the FMLA, Plaintiff engaged in protected activity. *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 634 (7th Cir. 2009). And Plaintiff undoubtedly suffered an adverse employment action when she was terminated on November 16, 2020. *Id.* "Therefore," the Court "need only determine whether the record . . . supports the inference that" the two are causally related. *Id.* Plaintiff "need not prove that retaliation was the only reason for her termination; she may establish

---

[20]     Although *Bagwe* concerned a claim of retaliation under Title VII, Courts "'assess . . . claim[s] of FMLA retaliation in the same manner' as retaliation claims brought '"under other statutes, such as the ADA or Title VII."'" *Burnett*, 472 F.3d at 481 n.5 (quoting *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 504 n.3 (7th Cir. 2004)).

an FMLA retaliation claim by 'showing that the protected conduct was a substantial or motivating factor in the employer's decision.'" *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 741–42 (7th Cir. 2008) (quoting *Culver v. Gorman & Co.*, 416 F.3d 540, 545 (7th Cir. 2005)).

Plaintiff's filings point to three incidents that, in her view, suggest discriminatory animus. First, Plaintiff claims that Gwendolyn Stubblefield permitted "potential employers inter-departmental" as well as "an employee" to contact her while she was on FMLA leave. [Dkt. No. 68, 3]. So far as the Court can tell, this claim is made for the first time in Plaintiff's summary judgment filings and lacks any foundation in the record. Therefore, the Court cannot consider it. Second, Plaintiff points to Defendant's insistence that she accept the medical driver position, even though they knew it was contrary to her medical restrictions. [Dkt. No. 64, 8]. And third, Plaintiff describes an incident in which Stubblefield allegedly refused to file a workers' compensation claim on Plaintiff's behalf, apparently because Plaintiff had been drawing on long- and short-term disability. [Dkt. No. 64, 7–8]; [Dkt. No. 65, 3].

The problem with this evidence is that—even construing it in the light most favorable to Plaintiff—it has no obvious connection to Plaintiff's decision to take FMLA leave.[21] As for the worker's compensation incident, Plaintiff herself attributes

---

[21]     Because the Court holds that Defendant is entitled to summary judgment on this ground, it need not consider Defendant's primary argument—that because Plaintiff was terminated long after she exhausted her FMLA leave, that termination cannot form the basis for a retaliation claim. Defendant cites *Breneisen v. Motorola, Inc.*, 656 F.3d 701, 705 (7th Cir. 2011), for this proposition. This argument was squarely rejected at the motion to dismiss stage. [Dkt. No. 16, 2] ("That argument is wrong, as the FMLA's protection against retaliation extends beyond the statutory leave period; otherwise employers would be free to retaliate against employees for taking FMLA leave once the leave period expires."). Therefore, it is law

Stubblefield's alleged refusal to file her claim to prejudice against Plaintiff for "us[ing] Long and short term disability for income," not to her decision to take FMLA leave. [Dkt. No. 66, 5]; *see also* [Dkt. No. 69, 1] ("Also the denial of the right of the plaintiff to file workman's compensation claim based upon Defendant's knowledge of plaintiff having been insured with Long term and Short Term Disability."). And it is difficult to see how the decision to offer Plaintiff the medical driver position suggests that Defendant harbored discriminatory animus against Plaintiff for taking FMLA leave.

On this record, no reasonable jury could find that Defendant's decision to terminate Plaintiff was even substantially motivated by animus against Plaintiff's decision to exercise her rights under the FMLA. Not only was Plaintiff able to exhaust her leave without incident, Defendant delayed its decision to terminate her until it could be sure that there was nothing it could do to accommodate her disability. Plaintiff has failed to muster the kind of evidence necessary to plausibly suggest that unlawful animus was lurking beneath the surface of Defendant's efforts to accommodate her disability. Defendant is therefore entitled to summary judgment on this last claim as well.

---

of the case and entitled to substantial deference. *See Mendenhall v. Mueller Streamline Co.*, 419 F.3d 686, 691 (7th Cir. 2005) ("In situations where a different member of the same court re-examines a prior ruling, 'the law of the case doctrine . . . reflects the rightful expectation of litigants that a change of judges midway through a case will not mean going back to square one.'" Quoting *Best v. Shell Oil Co.*, 107 F.3d 544, 546 (7th Cir. 1997)).

IV.     **Conclusion**

Defendant's motion for summary judgment [Dkt. No. 58] is granted. Plaintiff's cross-motion for summary judgment is denied. Plaintiff is advised that this is a final decision ending the case in this Court. If she wishes to appeal, she must file a notice of appeal with this Court within 30 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). Civil case terminated.

Enter: 22-cv-0837
Date: August 4, 2023

Lindsay C. Jenkins
United States District Court Judge

46